# RECORD NO. 15-1720

In The

# United States Court Of Appeals
## For The Fourth Circuit

**UNITED STATES ex rel. LYNN E. SZYMONIAK,**

*Plaintiff – Appellant,*

and

STATES OF CALIFORNIA, DELAWARE, FLORIDA, HAWAII, ILLINOIS, INDIANA, MASSACHUSETTS, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, VIRGINIA, DISTRICT OF COLUMBIA, AND THE CITIES OF CHICAGO AND NEW YORK, ex rel. LYNN E. SZYMONIAK,

*Plaintiffs,*

v.

# AMERICAN HOME MORTGAGE SERVICING, INC;
# SAXON MORTGAGE SERVICES INC.; LENDER PROCESSING SERVICES INC;
# DOCX LLC; BANK OF NEW YORK MELLON CORPORATION;
# DEUTSCHE BANK NATIONAL TRUST COMPANY;
# DEUTSCHE BANK TRUST COMPANY AMERICAS;
# HSBC USA NATIONAL ASSOCIATION,

*Defendants – Appellees,*

and

CITIMORTGAGE INC, f/k/a Citi Residential Lending Inc., f/k/a AMC Mortgage Services Inc.; WELLS FARGO HOME MORTGAGE, d/b/a America's Servicing Company; BANK OF AMERICA CORPORATION, as successor in interest to Lasalle Bank; CITIBANK NATIONAL ASSOCIATION.; JP MORGAN CHASE BANK NATIONAL ASSOCIATION; US BANK NATIONAL ASSOCIATION; WELLS FARGO BANK NATIONAL ASSOCIATION,

*Defendants,*

v.

# ROGERS TOWNSEND & THOMAS, PC,

*Party-in-Interest.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AT ROCK HILL**

—————————————

# BRIEF OF APPELLANT

—————————————

**Richard A. Harpootlian
Christopher P. Kenney
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street
P.O. Box 1090
Columbia, SC 29202
(803) 252-4848**

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __15-1720__    Caption: __US ex rel Szymoniak v. American Home Mortgage Servicing, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__ex rel Lynn Szymoniak__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                    ☐YES ☑NO
        If yes, identify all parent corporations, including grandparent and great-grandparent
        corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                        ☐YES ☑NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/Richard A. Harpootlian          Date: July 14, 2015

Counsel for: Appellant

## CERTIFICATE OF SERVICE
**************************

I certify that on ____July 14, 2015____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/Richard A. Harpootlian                           July 14, 2015
        (signature)                                      (date)

# TABLE OF CONTENTS

**Page**:

TABLE OF AUTHORITIES ............................................................ ii

INTRODUCTION .......................................................................1

JURISDICTIONAL STATEMENT ..........................................3

STATEMENT OF THE ISSUES...........................................4

STATEMENT OF THE CASE...............................................5

SUMMARY OF ARGUMENT ..............................................24

STANDARD OF REVIEW ...................................................25

ARGUMENT ........................................................................25

    I.    The District Court misconstrued the rule articulated in <u>Nathan</u> to require something more than a pleading that gives notice of the who, what, where, when, and how of a fraud ...............................26

    II.    A *per se* rule is irreconcilable with the rules of pleading and the FCA ...................................................................................34

        A.    Identification of individual claims presented for payment is unnecessary to meet Rule 9(b)'s objectives ..........................35

        B.    A *per se* rule threatens the efficacy of the FCA as a remedial tool to fight fraud against the government.................39

CONCLUSION ...................................................................47

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s):</u>

<u>Cases</u>:

Am. Civil Liberties Union v. Holder,
    673 F.3d 245 (4th Cir. 2011) ........................................................................11

Ashcroft v. Iqbal,
    556 U.S. 662 (2009).........................................................................27, 32, 38

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544 (2007).........................................................................26, 27, 38

Chesbrough v. VPA, P.C.,
    655 F.3d 461 (6th Cir. 2011) ........................................................................45

Claudio-De Leon v. Sistema Universitario Ana G. Mendez,
    775 F.3d 41 (1st Cir. 2014)............................................................................41

DiLeo v. Ernst & Young,
    901 F.2d 624 (7th Cir. 1990) ........................................................................35

Ebeid ex rel. U.S. v. Lungwitz,
    616 F.3d 993 (9th Cir. 2010) .................................................................33, 44

Francis v. Giacomelli,
    588 F.3d 186 (4th Cir. 2009) .................................................................26, 27

Harrison v. Westinghouse Savannah River Co.,
    176 F.3d 776 (4th Cir. 1999) (Harrison I) ..........................................*passim*

Ortho Biotech Prods., L.P. v. United States ex rel. Duxbury,
    130 S. Ct. 3454 (2010) (No. 09-654)...........................................................43

Smith v. McCarthy,
    349 F. App'x 851 (4th Cir. 2009)..................................................................25

United States ex rel. Bledsoe v. Community Health Sys., Inc.,
    501 F.3d 493 (6th Cir. 2007) ........................................................................45

United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.,
 741 F.3d 390 (4th Cir. 2013) ...............................................41, 42

United States ex rel. Clausen v. Lab. Corp. of Am.,
 290 F.3d 1301 (11th Cir. 2002) .......................................32, 33, 46

United States ex rel. Drakeford v. Tuomey,
 792 F.3d 364 (4th Cir. 2015) ......................................................42

United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.,
 579 F.3d 13 (1st Cir. 2009)................................................*passim*

United States ex rel. Grubbs v. Kanneganti,
 565 F.3d 180 (5th Cir. 2009) ............................................*passim*

United States ex rel. Joshi v. St. Luke's Hosp., Inc.,
 441 F.3d 552 (8th Cir. 2006) ......................................................45

United States ex rel. Karvelas v. Melrose-Wakefield Hosp.,
 360 F.3d 220 (1st Cir. 2004)......................................................41

United States ex rel. Lemmon v. Envirocare of Utah, Inc.,
 614 F.3d 1163 (10th Cir. 2010) .................................................45

United States ex rel. Lusby v. Rolls-Royce Corp.,
 570 F.3d 849 (7th Cir. 2009) ............................................*passim*

United States ex rel. May v. Purdue Pharma L.P.,
 737 F.3d 908 (4th Cir. 2013) ......................................................21

United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.,
 961 F.2d 46 (4th Cir. 1992) ................................................. 39-40

United States ex rel. Nathan v.
Takada Pharmaceuticals North America, Inc.,
 707 F.3d 451 (4th Cir. 2013) .............................................*passim*

United States ex rel. Nathan v. Takeda Pharm. North Am., Inc.,
 134 S. Ct. 1759 (2014) (No. 12-1349).....................................43, 44

United States ex rel. Palmieri v. Alpharma, Inc.,
  No. 14-1388 (4th Cir. June 9, 2014)............................................................44

United States ex rel. Rost v. Pfizer, Inc.,
  507 F.3d 720 (1st Cir. 2007)............................................................40, 41

United States ex rel. Sikkenga v. Regence BlueCross BlueShield,
  472 F.3d 702 (10th Cir. 2006) ............................................................44

United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v.
Blue Cross Blue Shield of Ga., Inc.,
  755 F. Supp. 1055 (S.D. Ga. 1990) ............................................................35

United States ex rel. Thayer v. Planned Parenthood of the Heartland,
  765 F.3d 914 (8th Cir. 2014) ............................................................ 45-46

United States ex rel. Walker v. R&F Properties of Lake County, Inc.,
  433 F.3d 1349 (11th Cir. 2005) ............................................................46

United States ex rel. Willard v. Humana Health Plan of Texas Inc.,
  336 F.3d 375 (5th Cir. 2003) ............................................................27

United States ex rel. Wilson v. Kellogg Brown & Root, Inc.,
  525 F.3d 370 (4th Cir. 2008) ............................................................27, 35

United States v. Bank of America Corp.,
  1:12-cv-00361-RMC............................................................ 14-15

United States v. Mackby,
  339 F.3d 1013 (9th Cir. 2003) ............................................................42

United States v. Neifert–White Co.,
  390 U.S. 228 (1968)............................................................11, 44

Walters v. McMahen,
  684 F.3d 435 (4th Cir. 2012) ............................................................27

**Statutes:**

18 U.S.C. § 1001 ............................................................8

18 U.S.C. § 1010............................................................8

18 U.S.C. § 1014 ...................................................................................8

18 U.S.C. § 1028 ...................................................................................8

18 U.S.C. § 1341 ...................................................................................8

18 U.S.C. § 1342 ...................................................................................8

18 U.S.C. § 1343 ...................................................................................8

18 U.S.C. § 1344 ...................................................................................8

28 U.S.C. § 1291 ...................................................................................3

28 U.S.C. § 1331 ...................................................................................3

31 U.S.C. §§ 3729, <u>et</u> <u>seq</u>. ................................................................*passim*

31 U.S.C. § 3729(a)(1)(A) ...........................................................10, 39

31 U.S.C. § 3729(a)(1)(B) ...................................................................39

31 U.S.C. § 3729(b)(2) .........................................................................11

31 U.S.C. § 3730 ..................................................................................20

31 U.S.C. § 3730(b)(1) .........................................................................11

31 U.S.C. § 3730(b)(2) .........................................................................11

31 U.S.C. § 3730(b)(3) .........................................................................11

31 U.S.C. § 3730(c)(3) .........................................................................11

31 U.S.C. § 3730(d) ..............................................................................15

31 U.S.C. § 3730(e)(4) .........................................................................20

31 U.S.C. § 3730(e)(4)(A) ....................................................................20

Fla. Stat. § 117.05 ..................................................................................8

**Regulation**:

17 C.F.R. § 229.1122(d)(4) ................................................................5

**Rules**:

Fed. R. Civ. P. 8 ................................................................*passim*

Fed. R. Civ. P. 8(a)(2) ........................................................26

Fed. R. Civ. P. 9 ................................................................26

Fed. R. Civ. P. 9(b) ............................................................*passim*

Fed. R. Civ. P. 12(b)(6) ................................................3, 25, 26

**Other Authorities:**

BLACK'S LAW DICTIONARY 70 (5th ed. 1979) .............................8

HUD website, "The Federal Housing Administration (FHA),"
available at: http://portal.hud.gov/
     last visited Sept. 13, 2015 ...........................................18

RealtyTrac website, available at: http://www.realtytrac.com/
     last visited Sept. 25, 2015 ...........................................6

S. Rep. No. 345, 99th Cong., 2d Sess. 24 (1986) ......................11

S. Rep. No. 99–345 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5276 .............39

## INTRODUCTION

The fraudulent conduct at issue in this federal False Claims Act (FCA) case has cost the federal government billions of dollars and has already resulted in criminal convictions, jail sentences, and a settlement with the federal government in which five banks paid $95 million to settle Appellant's claims.

Through an extensive investigation requiring expert skills, including forensic document examination and knowledge of insurance claims' documentation, Appellant discovered that fraudulent mortgage assignments, note endorsements, and affidavits were routinely being used in foreclosures filed across the country. These documents, whose defects include forged signatures, fraudulent notarizations, unauthorized signers, and backdating, were created by mortgage servicers on behalf of banks and mortgage trusts to expedite foreclosure actions filed against thousands of homeowners in default following the 2008 global financial crisis that brought the nation's economy to its knees.

These fraudulent foreclosure documents were then used by lenders and investors to recoup their losses through the submission of tens of thousands of insurance claims to the United States Department of Housing and Urban Development ("HUD") for payment pursuant to the Federal Housing Administration's ("FHA") mortgage insurance program. These assignments and endorsements not only resulted in billions of dollars of HUD insurance payments,

but the cost of creating these fraudulent documents was charged to and reimbursed by HUD.

Appellees argued that Appellant's complaint—which provided a detailed description of the who, what, where, when, how, and why these fraudulent documents were created—failed for want of particularity because, notwithstanding Appellant's detailed knowledge of the scheme, it was impossible for her to know which fraudulent documents were presented to HUD by whom. The District Court credited this argument, reasoning that this Court's decision in United States ex rel. Nathan v. Takada Pharmaceuticals North America, Inc., 707 F.3d 451 (4th Cir. 2013) imposed a threshold pleading requirement on a *qui tam* relator to identify specific false claims presented to the government even when a pleader alleges the defendant *caused* a false claim to be submitted by furnishing a materially false document to an unwitting third party knowing it would be used to make a call on the federal fisc.

This appeal asks whether Nathan imposes a rigid pleading requirement that insulates perpetrators of the massive fraud at issue here from being haled into court when the *qui tam* relator has actual knowledge of a fraudulent scheme that *causes* a third party to submit fraudulent claims to the government, but lacks personal knowledge of the precise manner in which banks and mortgage servicers submitted claims to HUD. The court below held it does. Respectfully, it does not.

## <u>JURISDICTIONAL STATEMENT</u>

Appellant filed this action in the United States District Court for the District of South Carolina, Rock Hill Division, on June 4, 2010, pursuant to 28 U.S.C. § 1331, asserting causes of action arising under the federal False Claims Act, 31 U.S.C. §§ 3729, <u>et</u> <u>seq.</u>, and analogous state false claims statutes.

The District Court granted Appellees' motion to dismiss, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on July 25, 2014. An order dismissing all remaining claims was entered on May 28, 2015. On June 26, 2015, Appellant filed a notice of appeal to this Court.

This is an appeal from a final judgment dismissing all of Appellants' claims over which this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.     Whether this Court's decision in United States ex rel. Nathan v. Takeda Pharmaceuticals North America, Inc., 707 F.3d 451 (4th Cir. 2013) established a *per se* pleading requirement that a False Claims Act relator identify specific claims presented for payment or whether identifying specific claims is merely one way a pleader can satisfy Rule 9(b)'s particularity requirement?

II.     Whether the rigid *per se* pleading requirement, to the extent Nathan imposes one, should be revisited where it imposes a greater burden than required by Rule 9(b) and serves to effectively eliminate a theory of False Claims Act liability?

## STATEMENT OF THE CASE

Residential home buyers typically borrow money from a bank or mortgage company to finance the purchase of real property. Home loans are memorialized by a promissory note secured by a mortgage. Both the note and mortgage are signed by the borrower and by an officer of the bank or mortgage company that originates the loan. J.A. 252. The lender records the mortgage as a lien against the property by filing a copy with the county recorder's office in the county where the property is located. Any transfer of the obligation is accomplished by endorsing the note and assignment of the mortgage. J.A. 252-53.

Many mortgage loan originators do not retain ownership for long, but instead pool together a group of loans and sell them to a trust, which in turn sells investors a mortgage-backed security ("MBS") investment that promises to generate a return on investment in the form of payments on the mortgages in the pool. Creation of a MBS trust generally involves transfer of trust assets, *i.e.*, the notes and mortgages, from the originators to a sponsor, then to a depositor who, in turn, transfers them to the trustee. J.A. 265-66. Each trust is governed by a Pooling and Service Agreement ("PSA") and other investment documents filed with the Securities and Exchange Commission ("SEC"). PSAs obligate the trustee to certify that all trust assets have been properly transferred into the trust. J.A. 255, 266-267, 319, 322-23, 339 & 343; see also 17 C.F.R. § 229.1122(d)(4). Trustees often hire a

custodian to maintain actual possession of these legal instruments. See, e.g., J.A. 256, 266-68, 273, 319-23. Each trust also has a master servicer, and often sub-servicers, responsible for collecting monthly mortgage payments (the revenue stream promised to investors) and pursuing foreclosure when borrowers default. J.A. 265-66. MBS investors receive *pro rata* shares of the principal and interest collected on the pooled assets, less fees and expenses charged to administer the trust.

By 2009, MBS trusts held approximately one-third of all residential mortgages in the United States. J.A. 265. In 2008, the nation was plunged into a global financial crisis and recession, the likes of which had not been seen since the 1930s. The resulting economic calamity, now understood to have been caused by reckless lending fueling rampant speculation, gave rise to more than 15 million foreclosure filings during the last seven years.[1] The massive public fraud at issue in this case is the story of how Appellees used fraudulent documents to shift losses incurred as a result of these reckless lending practices to the federal government and its taxpayers.

\* \* \*

---

[1] While statistics greatly vary, RealtyTrac, an online foreclosure database, reports that nationwide, 1.28 million homes entered foreclosure in 2007, 2.33 million in 2008, 2.82 million in 2009, 2.87 million in 2010, 1.88 million in 2011, 1.83 million in 2012, 1.36 million in 2013, and 1.11 million in 2014. See RealtyTrac website, available at: http://www.realtytrac.com/ (last visited Sept. 25, 2015).

Appellant is a lawyer and insurance fraud examiner whose work has included teaching fraud seminars at FBI headquarters in Quantico, Virginia, assisting state insurance regulators with fraud investigations, and serving as a testifying expert in state and federal courts. J.A. 244-45. In 1998, Appellant purchased her home in Palm Beach Gardens, Florida. J.A. 253. The loan was refinanced in 2006 with a loan from Option One. Id. Two years later, a dispute arose between Appellant and her lender concerning the payment amount, which resulted in Relator defaulting on her payments. J.A. 254. Appellee Deutsche Bank National Trust Company (DBNTC) initiated a foreclosure proceeding in state court as trustee for a mortgage-backed securities trust, claiming it owned the Option One note, but that the original note was lost or destroyed. Id. DBNTC's foreclosure complaint failed to attach any assignment of the mortgage, nor did it explain the circumstances under which the trust acquired the note. Id.

To the contrary, trust filings dated 2006 claimed that the trust custodian (Defendant Wells Fargo) reviewed, filed, and maintained these documents as proof of the trust's right to profit from these investment assets. J.A. 254-56. Appellant, having first learned that her loan was held by a mortgage-backed security trust when DBNTC filed its lawsuit, moved the Florida court to dismiss the foreclosure action, arguing DBNTC failed to produce a filed or recorded assignment of Appellant's mortgage. See J.A. 254, 256. In response, DBNTC filed a copy of the

note it previously claimed was lost or destroyed, an allonge,[2] and a mortgage assignment. J.A. 257.

Appellant identified the mortgage assignment as fraudulent. J.A. 257-58. Appellant's conclusion was supported by her discovery that (1) the assignment's execution date *post-dated* the filing of the foreclosure action; (2) that the individuals signing as officers of assignee Appellee American Home Mortgage Servicing, Inc. were, in fact, employees of the mortgage servicing company Appellee Lender Processing Services (LPS) or its subsidiary, DocX, LLC; (3) that these signatures themselves were likely forged by other individuals; and (4) that the purported witness signatures were also forged. J.A. 257-58; see also J.A. 263, 272-316 (detailing the same fraud by the other Defendants and their agents). The creation and use of this fraudulent document in a state court proceeding violates Florida law and at least eight federal laws.[3] While Appellant eventually settled the DBNTC foreclosure case by paying her mortgage in full, her investigation in furtherance of that protracted litigation alerted her to the vast fraud at issue here.

_____

[2] An "allonge" is defined as "[a] piece of paper annexed to a bill of exchange or promissory note, on which to write endorsements for which there is no room on the instrument itself." BLACK'S LAW DICTIONARY 70 (5th ed. 1979).

[3] See Fla. Stat. § 117.05 (concerning false or fraudulent acknowledgments); 18 U.S.C. § 1001 (concerning statements or entries generally), § 1010 (concerning HUD and FHA transactions), § 1014 (concerning loan and credit applications), § 1028 (concerning fraud and related activity in connection with identification documents), § 1341 (concerning mail fraud), § 1342 (concerning fictitious names or addresses), § 1343 (concerning wire fraud), and § 1344 (concerning bank fraud).

Appellant began reviewing public records—first in Florida and then California, Colorado, Georgia, Illinois, Massachusetts, New Jersey, New York, North Carolina, South Carolina, and Washington—in an effort to uncover fraudulent documents similar to those used by DBNTC. J.A. 259-60. Specifically, she reviewed mortgage assignments, lost note affidavits, mortgage releases, and *lis pendens* from public record databases and compared these records to originals sent to her by distressed homeowners in response to a series of articles about her findings that she began publishing online in January 2010. J.A. 260. As was the case with her mortgage, Appellant discovered than many of the signatories posing as corporate officers with authority to execute legal instruments were in fact employees of servicer (and Appellee) DocX. J.A. 271.

As a result of this painstaking and tedious work, Appellant ultimately identified more than 2,000 mortgage-backed securities trusts whose investment assets were "conveyed" to the trust through the use of fraudulent documents— conveyances that in many cases occurred years *after* the trust closing date, *after* the loans were in default, and close in time to the filing of a foreclosure. J.A. 261, 446-535. These "default-dated assignments" were prepared primarily by Appellees DocX, LPS, Litton, Ocwen, and others. J.A. 262.

On December 27, 2009, Appellant contacted an Assistant U.S. Attorney in Jacksonville, Florida, and disclosed her initial findings of fraud by DocX and, over

the next few weeks, sent examples of hundreds of fraudulent documents and other research to the government's lawyer. J.A. 264. Appellant also began reporting her findings to the Federal Deposit Insurance Corporation; the United States House of Representatives' Financial Oversight Committee and Housing and Community Opportunity Subcommittee, the Financial Crisis Oversight Commission, state and federal prosecutors in Florida, and various Florida clerks of court. Id.

In mid-January 2010, the FBI sought Appellant's assistance with an investigation of DocX and LPS. J.A. 264. As a result of this investigation, LPS employee Lorraine Brown pled guilty to conspiracy to commit mail and wire fraud and was sentenced to serve five years in prison. Id. The government also reached a non-prosecution agreement with LPS, in which it agreed to pay $45 million in criminal penalties and forfeitures. J.A. 264-65. On January 2013, LPS entered into a $127 million settlement with 49 attorneys general. J.A. 265.

\* \* \*

The FCA imposes treble damages and civil penalties against any person who, *inter alia*, "knowingly presents, *or causes to be presented*, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A) (emphasis added). This Court has long recognized the long reach of the FCA to encompass "all types of fraud, without qualification, that might result in financial loss to the Government[.]" Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 788

10

(4th Cir. 1999) (quoting <u>United States v. Neifert–White Co.</u>, 390 U.S. 228, 232 (1968)). "Thus, any time a false statement is made in a transaction involving a call on the U.S. fisc, False Claims Act liability may attach." <u>Id.</u> Stated in the parlance of the Act, a "claim" includes "any request or demand … for money or property … presented to an officer, employee, or agent of the United States[.]" 31 U.S.C. § 3729(b)(2).

The FCA's *qui tam* provisions allow a private person to bring suit "for the person and for the United States Government." <u>Id.</u> § 3730(b)(1). When a private person (called a "relator") brings the action, the complaint is filed under seal and served upon the government along with the material evidence in the relator's possession. <u>Id.</u> § 3730(b)(2). Once served, the government has 60 days to intervene and proceed with the action. <u>Id.</u> If the government declines to intervene, the relator "shall have the right to conduct the action," subject to the government's right to intervene at a later date upon good cause shown. <u>Id.</u> §§ 3730(b)(3) & (c)(3). The purpose of the *qui tam* seal is to afford the United States time to investigate the merits of a relator's allegations prior to deciding whether to adopt or intervene in the case. <u>See id.</u>; <u>see also</u> <u>Am. Civil Liberties Union v. Holder</u>, 673 F.3d 245, 250 (4th Cir. 2011); S. Rep. No. 345, 99th Cong., 2d Sess. 24 (1986).

Appellant filed this case under seal on June 4, 2010. On June 18, 2010, the Government moved the Court to partially lift the seal to allow the Government to

11

disclose the complaint to the Defendants for the purpose of settlement negotiations. Dkt. No. 6 at 3.[4] The Government also sought to "extend the seal period for an additional twelve (12) months … to permit the United States to complete its investigation[,]" while also noting that "[t]he same matters contained in the *qui tam* action are the subject of criminal investigations in Florida and South Carolina." Id. at 2. The District Court granted the motion. J.A. 66-68.

Over the next nine months, the Government asked the Court to partially lift the *qui tam* seal on three different occasions to allow it to disclose the existence of the action to the Defendants, the Federal Reserve Bank of New York, and state regulators in plaintiff states. See Dkt. Nos. 11, 14 & 19. These applications continued to reassure the District Court that the Government was "investigating the allegations" and that flexibility was needed "[b]ecause of the size and scope of the investigation[.]" Dkt. No. 19 at 2. These requests were all granted. Dkt. Nos. 12, 15 & 20. The District Court also held a March 7, 2011 hearing to obtain a status report from the Government. See Dkt. No. 22. During this period, the complaint was twice amended. See Dkt. Nos. 24, 28, 29, 32, 33 & 35.

Fourteen months after the action was filed, on July 27, 2011, the Government moved the District Court to extend the seal "for an additional four months … to permit the United States to complete its investigation" and to ensure

---

[4] All docket citations contained herein are to the District Court's docket.

the seal deadline would coincide with a companion *qui tam* action filed by Appellant in the Western District of North Carolina. Dkt. No. 40 at 2. The District Court held another status conference and found good cause to grant the request, explaining that "[t]he allegations are serious, involve numerous defendants, and are the subject of criminal investigations in South Carolina and Florida[,]" and that the Government "needs time to thoroughly investigate the allegations." See Dkt. No. 45; J.A. 220-21.

On December 7, 2011, the Government moved a third time seeking a seal extension—this time by six months. Dkt. No. 57 at 2. The Government's request sought to assure the Court that additional time would be wisely used, explaining that during the most recent extension, government lawyers and investigators "have spent more than 1,000 man hours investigating this case." Dkt. No. 57 at 6. Appellant aided this effort by "identif[ying] 1,400 trusts which she alleges are associated with misconduct" that the Government reviewed through a "labor intensive and time consuming process" that "proved fruitful" in discerning whether it held a financial stake in any of the securities tainted by fraudulent documents. Dkt. No. 57 at 6. The Government also reported interviewing witnesses and sending review teams to document warehouses across the country. Id. at 6-7.

> Progress in investigating this case has not been helped by the fact that there is no investigative agency. All of the investigative resources are from the United States Attorney's office or from the Department of Justice, Civil Division. Additionally, the defendants have been

13

unwilling to allow Relator's counsel access to mortgage files. Thus, Relator's counsel have not be able to participate in the review of documents. …

The United States further notes that because of the partial lifting of the seal, all of the defendants in this case are aware of the allegations against them. Defendants have proven, for the most part, willing to cooperate in the Department's investigation, and have been responsive to the opportunity to state their position as to Relator's claims. This is not a case where the government's investigation is taking place without knowledge of the defendants. Although they have not yet been served or made parties to the case, there is no knowledge deficit as to the existence of claims against them here. Defendants and the United States are involved in a productive iterative process where the defendants are considering and commenting on Relator's claims, the government is diligently collecting facts, and each side is challenging one another based upon their analysis and investigation. These efforts will likely focus the case, and may narrow the issues prior to the need for active litigation.

Finally, the Department of Justice has been involved in settlement negotiations with five of the defendants in this case. Those discussions are continuing and may result in the resolution of some or all of the issues in the instant qui tam. Extension of the seal may benefit those discussions. Additional time would also allow the United States the opportunity to discuss the possibility of settlement with additional defendants.

Id. at 8-9. The motion was granted. J.A. 222-23.

On February 10, 2012, some 20 months after the case was filed, the Government informed the District Court of an imminent settlement with six Defendants by seeking a full lift of the *qui tam* seal as to the settling Defendants. See Dkt. No. 72. That motion was granted (Dkt. No. 73), and on April 4, 2012, the Government instigated an action in the District of Columbia, captioned United

States v. Bank of America Corp., 1:12-cv-00361-RMC and commonly referred to as the "National Mortgage Settlement," as a settlement vehicle to resolve a variety of mortgage lending and servicing claims against Defendants Bank of America Corporation; CitiBank N.A.; CitiMortgage, Inc.; J.P. Morgan Chase Bank, N.A.; and Wells Fargo Bank, N.A. and Wells Fargo Home Mortgage. The claims settled by the National Mortgage Settlement alleged "servicing misconduct related to missing documents, and the FHA insurance claims, are the portion of the case that was resolved with the settling defendants" (Dkt. No. 87 at 6), and credited this action with recovering $95 million of the total settlement proceeds. The Government filed a notice of partial intervention in this case and a stipulation dismissing the Settling Defendants as to all other claims. See Dkt. Nos. 81 & 82. Appellant received an $18 million bounty, pursuant to 31 U.S.C. § 3730(d), in recognition for her efforts.

On June 6, 2012, the Government filed its fourth request to extend the seal by another six months, again citing the scope and complexity of the matter and continued efforts to settle the case, but also touting the National Mortgage Settlement as evidence of "significant progress in the case." See Dkt. No. 87 at 3-4. The District Court granted the extension (J.A. 224-25), but the following week entered a *sua sponte* order noting the four prior extensions to the seal and informing the Government that:

15

The court issues this order to provide appropriate advance notice to the United States that this court will look with extreme disfavor on any further attempts to postpone a decision in this case. If the December 10, 2012 deadline is extended, it will necessarily cause this case to appear on this court's [list] of three-year-old cases, which must b[e] reported to the Administrative Office of the United States Courts, together with an explanation by this court of why the court has not acted in a timely fashion to bring this case to a conclusion. In many respects, this case is still in its infancy. For this reason, the government should be fully advised that any further attempts to postpone the date on which the government must make a determination of its intention in this case will likely not be granted.

Dkt. No. 94.

On January 2, 2013, the District Court appointed the Honorable Louis J. Freeh as mediator and "encourage[d] all of the Federal and State governments and the Defendants to participate in discussions with the Mediator[.]" Dkt. No. 118 at 2. On February 8, 2013, the District Court entered an order memorializing its effort to encourage settlement through mediation, and inviting all of the parties to participate in a voluntary pre-mediation status conference. See Dkt. No. 121. Once again, the Court noted the "multiple occasions" on which it extended the Government's deadline to intervene, then set for March 11, 2013. Id. The Court also encouraged the parties to explore a negotiated resolution, explaining, "It strikes the court, however, that this case might be suitable for early mediation in view of the complexity of the issues involved and the potential cost of protracted litigation." Id.

During a February 25, 2013, telephone conference, the Court "inform[ed the] participants no more extensions if the mediation is not successful." Dkt. No. 130. By order dated February 26, the seal was extended until May 2, 2013. J.A. 226. On April 30, 2013, the District Court entered another Sealed Order stating, "This action has been pending for close to three years. The court hereby extends the seal in this case until Monday, July 1, 2013. However, the seal will not be extended further." J.A. 227. The parties conducted an unsuccessful mediation on May 20, 2013. See Dkt. No. 142 at 3.

On July 2, 2013 (one day after the seal was set to expire), the Government moved to "extend the seal period for an additional 30 days until July 31, 2013, on this False Claims Act qui tam case, to permit the [United States Attorneys' Office for the District of South Carolina] time to continue [settlement] negotiations." Dkt. No. 142 at 2. In support of that application, the Government again cited the National Mortgage Settlement as evidence of "significant progress" in resolving the remaining claims. Id. at 2-3. The Government also indicated that since mediation "at least two of the remaining defendants have expressed interest in continued negotiations[,]" and that the additional time sought was in furtherance of those negotiations. Id. at 3. The Court extended the seal until August 1, 2013, and again stated that "the seal will not be extended further." J.A. 228.

17

When this deadline finally came—three years and two months after this case was filed—the Government filed a notice of nonintervention and the District Court lifted the seal and ordered the complaint served. J.A. 229-31; Dkt. No. 149.

* * *

Appellant's Third Amended Complaint (J.A. 232-641), the operative complaint here, alleges the United States was harmed by insurance claims seeking to recoup foreclosure losses from FHA's mortgage insurance program. In 1934, Congress created FHA with a mandate to increase homeownership by insuring home loans made by approved lenders to homeowners who would otherwise be unable to obtain credit. See HUD website, "The Federal Housing Administration (FHA)," available at: http://portal.hud.gov/ (last visited Sept. 13, 2015). By 2001, the success of the program helped homeownership reach an all-time high of 68% with over 34 million mortgages insured during the program's 80 year history; making FHA the largest mortgage insurer in the world, responsible for insuring approximately one-third of all new residential mortgages in the United States. See id.; J.A. 371.

When a homeowner defaults on a federally insured mortgage and foreclosure fails to generate sufficient value to satisfy the remaining indebtedness, the lender is able to recoup the balance by making a FHA insurance claim. J.A. 373-74. In order to obtain payment from FHA, the lender (or subsequent

noteholder like a mortgage-backed security trust) must attach the note, mortgage, and assignment establishing its entitlement to exercise the rights conferred by those legal instruments.

Appellant alleged Defendants submitted fraudulent claims for FHA insurance payments *or caused them to be submitted* when they manufactured phony transfer instruments to justify thousands of foreclosures knowing these fraudulent documents would be submitted to HUD to recoup substantial losses. Since the FHA insurance program allows a lender to recoup the cost of the foreclosure itself, Appellant also alleged (and was able to demonstrate in discovery with respect to the one Defendant that remained in the District Court action) that Defendants' HUD insurance claims improperly included the cost of creating and filing untimely and fraudulent assignments with foreclosure courts. J.A. 373-74.

These allegations have never been refuted. To the contrary, after Appellant filed this action, HUD's Inspector General investigated these allegations and issued memoranda detailing findings with respect to five major banks: Ally Financial and Defendants Bank of America, Citibank, JP Morgan Chase, and Wells Fargo. J.A. 372-74. The Inspector General's reports detailed extensive noncompliance with HUD regulations and an institutional effort by these five banks to falsify legal documents in order to obtain foreclosures and collect FHA insurance payments. J.A. 372. Notably, the Inspector General concluded these practices resulted in

19

material misrepresentations to HUD that may have exposed them to FCA liability.

J.A. 373. While the Inspector General's conclusions were based on just a sample of

FHA-insured loans, his report notes that during a two-year period, the five banks

examined submitted nearly 100,000 claims worth approximately $12 billion. J.A.

372.

* * *

The remaining Defendants moved for dismissal advancing two theories.

First, they argued Appellant's claims were jurisdictionally barred as having been

publically disclosed prior to the commencement of this action and Appellant was

not an "original source" as required by § 3730(e)(4) of the FCA. The District Court

bifurcated oral argument by noticing a hearing on the jurisdictional arguments. As

the District Court recounts in its dismissal order,

> Two days before the scheduled hearing, on April 26, 2014, the United
> States, having earlier elected not to intervene in the case, notified the
> court of an objection. In its notice, the United States objected,
> pursuant to section 3730(e)(4)(A) of the FCA, to the dismissal on
> public disclosure grounds of any allegations in Relator's complaint
> relating to claims for payment submitted after March 22, 2010. This
> objection removed from the court's consideration the public
> disclosure defense as it related to claims for payment submitted on or
> after March 23, 2010.

J.A. 703 (footnote omitted). As the District Court correctly noted, Congress's

amendment to § 3730 of the FCA removed the jurisdiction-stripping language from

the public disclosure bar and instead granted the United States an absolute right to

20

block dismissal on this basis. <u>United States ex rel. May v. Purdue Pharma L.P.</u>, 737 F.3d 908, 916 (4th Cir. 2013) ("In our view, these changes make it clear that the public-disclosure bar is no longer a jurisdiction-removing provision.").

For her part, Appellant took extraordinary steps to simplify this action and narrow the scope of the issues in dispute. First, Appellant consented to the dismissal of all pre-March 23, 2010 claims, thus eliminating the need for the District Court to rule on the public disclosure issue. <u>See</u> J.A. 703. Second, Appellant voluntarily dismissed any claims remaining against the six National Mortgage Settlement Defendants. J.A. 704. Third, Appellant voluntarily dismissed, with the Government's consent, all claims relating to the Government's acquisition and holding of mortgage-backed securities.[5] <u>Id.</u> This left just nine Defendants to answer for claims arising from mortgage insurance claims submitted to HUD on or after March 23, 2010. <u>Id.</u> Thus the only issue before the District Court was Defendants' second theory of dismissal asking whether the Third Amended Complaint met the pleading requirements of Rules 8 and 9(b) of the Federal Rules of Civil Procedure. <u>See</u> J.A. 705. Defendants argued the complaint failed because it did not allege the presentment of fraudulent documents to HUD with sufficient particularity. J.A. 707.

---

[5] These allegations claimed that federal and state Plaintiffs were harmed when they invested in mortgage-backed security trusts backed by assets to which the trusts had no legal right. <u>See</u> J.A. 345-375.

In examining the issue, the District Court considered Appellant's theory of HUD liability in two parts. With respect to the claim that Defendants used fraudulent documents in furtherance of FHA insurance claims, the District Court conceded the Third Amended Complaint "alleges an elaborate scheme of surrogate signing and the manufacturing of fraudulent mortgage assignments, notes, and note endorsements[,]" and correctly understood Appellant's argument that "[l]iability on the HUD claim extends not only to the Defendants who submitted false claims to HUD but also to the Defendants who were involved in creating the false documents underlying the submissions." J.A. 710-11. Nevertheless, the District Court believed this Court's decision in <u>Nathan</u> compelled the conclusion that because Appellant "does not provide facts to show that this scheme actually results in the submission of specific false claims to HUD for payments pursuant to the FHA mortgage insurance program… [she] fail[ed] to provide the next link for FCA liability to attach—that Defendants submitted false claims to HUD for payments." J.A. 711. As for Appellant's theory that the cost of creating fraudulent documents was illegally passed to HUD, the District Court again relied on <u>Nathan</u> in support of its conclusion that, with one exception (Defendant U.S. Bank), the complaint lacked a particular claim of presentment because it failed to identify specific HUD claims incorporating the cost of this fraud. J.A. 715-17.

After Appellees were dismissed, Appellant litigated and eventually settled the claims remaining against Defendant U.S. Bank. On May 28, 2015, the Court entered an order dismissing U.S. Bank. J.A. 725. This appeal followed.

## SUMMARY OF ARGUMENT

The False Claims Act (FCA) is a remedial tool designed to fight fraud against the United States by authorizing suit by private individuals. A relator's claim under the FCA is subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, which requires that allegations of fraud be pled with particularity—a burden met by describing the who, what, when, where, and how of the alleged wrongdoing.

In <u>United States ex rel. Nathan v. Takeda Pharmaceuticals North America, Inc.</u>, this Court affirmed the dismissal of a complaint where the contention that fraudulent claims were submitted to the government for payment were built on a series of assumptions the district court found unreliable to support such an inference. The District Court in this case misread this Court's precedent to impose a stringent pleading requirement—the identification of individual claims presented to the government—that, if left in place, will drastically diminish the FCA's efficacy without furthering any legitimate pleading objective embodied by the federal rules. While Appellant does not believe this Court's decision in <u>Nathan</u> was intended to impose the rule applied below, to the extent that was the intent, it should be reconsidered and overruled.

## STANDARD OF REVIEW

This Court reviews a district court's grant of a motion to dismiss pursuant to Rule 12(b)(6) of the federal rules *de novo*. Smith v. McCarthy, 349 F. App'x 851, 856 (4th Cir. 2009).

## ARGUMENT

This case alleges that mortgage servicers and trustees tasked with recouping loan proceeds, first through foreclosures and then through the submission of FHA insurance claims, knowingly created fraudulent documents and thus submitted false claims to HUD or caused them to be submitted. In dismissing these claims, the District Court relied exclusively on one sentence in United States ex rel. Nathan v. Takeda Pharmaceuticals North America, Inc., 707 F.3d 451 (4th Cir. 2013), which, read in isolation, appears to impose a *per se* rule requiring *all* false claims actions to identify individual claims presented for payment in order to give rise to a sufficiently particular claim. This oversight is understandable as the District Court was clearly frustrated with the protracted nature of this action by the time this issue was ripe for decision. The rule adopted below dramatically hastened the resolution of this case (and removal from the court's docket) by narrowing its scope to just a single defendant. Nevertheless, the District Court's decision to dismiss Appellees turns on an erroneous reading of this Court's precedent and should be reversed.

25

However, to the extent this Court intended to adopt a rigid pleading requirement in deciding <u>Nathan</u>, it should now revisit that decision because it is inconsistent with the federal rules of pleading and effectively eliminates statutory liability for causing the submission of a false claim by rendering it all but impossible in a massive fraud case such as this for any whistleblower to plead allegations sufficient to hale the perpetrator into court. These arguments are considered in turn.

## I.    The District Court misconstrued the rule articulated in <u>Nathan</u> to require something more than a pleading that gives notice of the who, what, where, when, and how of a fraud.

The legal sufficiency of a complaint is measured by whether it meets the general rules of pleading set forth in Rule 8, the special rules of pleading set forth in Rule 9, and Rule 12(b)(6)'s requirement that a complaint state a claim for which relief can be granted. <u>Francis v. Giacomelli</u>, 588 F.3d 186, 192 (4th Cir. 2009). Rule 8 merely requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). This general rule has been construed to include a plausibility requirement that asks whether the pleader has pled "enough factual matter (taken as true) to suggest" that the alleged illegality occurred. <u>See</u> <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555-56 (2007). "The determination whether a complaint adequately states a plausible claim is a 'context-specific task,' in which the factual allegations of the complaint must be

examined to assess whether they are sufficient 'to raise a right to relief above the speculative level.'" Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), and Twombly, 550 U.S. at 555).

When "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b)'s particularity requirement applies to FCA claims, which, at their essence, sound in fraud. Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 783-84 (4th Cir. 1999) (Harrison I). To satisfy Rule 9(b), a FCA plaintiff "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008) (quoting Harrison I, 176 F.3d at 784). "These facts are often referred to as the 'who, what, when, where, and how' of the alleged fraud." Id. (quoting United States ex rel. Willard v. Humana Health Plan of Texas Inc., 336 F.3d 375, 384 (5th Cir. 2003)). Together, these pleading requirements ensure a defendant receives "adequate notice of the nature of a claim being made against him." Francis, 588 F.3d at 192.

By the District Court's own admission, the Third Amended Complaint meets this test by describing an "elaborate scheme" to create fraudulent foreclosure

documents. For example, the complaint describes the robo-signing process used to prepare thousands of fraudulent mortgage assignments and allonges for use in foreclosures and FHA insurance applications. J.A. 257, 274-312 & 315-16. These allegations are bolstered by specific examples of fraudulent documents, the names of individuals employed by Appellees whose names appear on these fraudulent documents, and a description of the false titles used in association with those names to create the appearance of a lawfully executed document. See id. In addition to the trust that purportedly owned Appellant's mortgage, the complaint identifies Appellees DBNTC and DBTCA as having securitized at least 958 MBS trusts containing these forged documents. J.A. 262. The complaint also points to specific examples of HUD insurance claims that incorporated the cost of creating, filing, and/or recording fraudulent documents. J.A. 373-74. Appellant also attached a list of approximately 1,900 MBS trusts that she identified as having used fraudulent foreclosure documents and specifically identified Appellees American Home Mortgage Servicing, Saxon Mortgage Services, DocX, and LPS, among others, as responsible for creating these fraudulent documents. J.A. 263 & 446-535.

The HUD Inspector General reports, released after this action was filed and detailing regulatory noncompliance and material misrepresentations in an effort to obtain FHA insurance payments, serve to further corroborate the large number of

fraudulent claims presented to HUD from October 1, 2008 through September 30, 2010. J.A. 372-73. The incorporation of the OIG's findings into the Third Amended Complaint is significant here because, while those banks are no longer parties to this action, the liability of Appellee-servicers responsible for creating the false documents used by those banks to submit more than 92,000 claims valued at $12 billion have *never* been discharged.[6] See J.A. 375 ("Liability on the HUD claim extends not only to the Defendants who submitted false claims to HUD but also to the Defendants who were involved in creating the false documents underlying the [Settled Defendants'] submissions.").

The Third Amended Complaint gives rise to a plausible inference that the fraudulent documents identified by the complaint (and others) were used to make FHA insurance claims by creating a nexus between the assets tainted by the fraud and MBS trust documents highlighting to investors the trusts' ability to claim FHA insurance proceeds. For example, the complaint cites publications by ratings agencies responsible for reviewing tainted trusts. See J.A. 371. These reports highlight the large number of FHA-insured assets held by the trusts as evidence of a low-risk investment backed by the federal government. See id. Similarly, the complaint also cites trust prospectuses that explain to potential investors that FHA insurance money will be deposited as trust proceeds and that "loans are insured up

---

[6] This includes those claims tied to non-defendant Ally Financial.

29

to an amount equal to 90% of the sum of the unpaid principal of the FHA loan."

J.A. 371-72. These documents also reassure investors that, while "HUD has the

option, in most cases, to pay insurance claims in cash or in debentures …[,]

[c]urrently, claims are being paid in cash, and claims have not been paid in

debentures since 1965." Id. In other words, no inferential leap is required to reach

the conclusion that the fraudulent documents Appellees created were submitted to

HUD because trust documents governing the treatment of these tainted assets

expressly contemplate and require the use of those documents to recoup investor

losses. What *is* implausible is that trustees saddled with a foreclosure deficiency

and fiduciary obligation to recoup investor losses, but armed with fraudulent

documents furnished by Appellees, would *not* attempt to recoup those losses by

calling on the promise of indemnification by a federal agency.

In holding that these allegations lacked particularity, the District Court

misconstrued Nathan to require identification of specific false claims—in this case,

individual HUD submissions—as the exclusive means through which a false

claims plaintiff can meets her obligation to place the opposing party on notice of

an alleged fraud. The more accurate reading of Nathan is that this Court merely

sought to explain that allegations identifying specific false claims presented for

payment constitute *one means* by which a pleader can satisfy Rule 9(b)'s

particularity requirement. This conclusion is supported by the plain language of the

Nathan decision which contextualized the failings of the complaint as specific to the allegations *in that case*.

In Nathan, a sales manager alleged a pharmaceutical company caused the submission of false claims through an off-label marketing scheme that violated federal law. Nathan, 707 F.3d at 454. The sales manager alleged that by furnishing physicians with a higher dose of the drug, the company misled doctors into believing it was the only available dose and approved to treat conditions for which it had no FDA-approved use. Id. at 454-55. The sales manager alleged further that this marketing scheme caused false claims to be presented for payment to federal insurance programs. Id. Notably, the sales manager's conclusion that false claims were presented for payment relied on a series of assumptions the likes of which are not present here. He assumed physicians receiving misleading drug samples in turn wrote prescriptions for off-label uses. Id. at 459. He also assumed that since 93% of the pharmaceutical company's sales were for the higher dosing, at least 90% of the prescriptions he identified as *potentially* fraudulent must have been written for the higher, unapproved dosing. Id.

This Court found the sales manager's series of speculative assertions too implausible to support an inference false claims were presented to the government for payment. The Court reasoned that Rule 9(b)'s particularity requirement

31

does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply *and without any stated reason for his belief* that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government. Rather, Rule 9(b) requires that *some indicia of reliability* must be provided in the complaint to support the allegation that an actual false claim was presented to the government. Indeed, without such plausible allegations of presentment, a relator not only fails to meet the particularity requirement of Rule 9(b), but also does not satisfy the general plausibility standard of Iqbal.

Id. at 456-57 (quoting United States ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1313 (11th Cir. 2002)) (internal quotations and citations omitted) (emphasis added). Accordingly, when a defendant's actions "*could* have led, but *need not necessarily* have led, to the submission of false claims, a relator must allege with particularity that specific false claims actually were presented to the government for payment." Id. at 457 (emphasis original). Put differently, the rule in Nathan merely explains that when an inference of presentment does not necessarily flow from the facts alleged, a pleader can cross that threshold by identifying specific false claims to show presentment did occur.

But the rule in Nathan is not a rigid one as this Court was both cautious and clear that its holding should not be misconstrued as a *per se* rule:

We further emphasize, however, that the standard we articulate today does *not* foreclose claims under the Act when a relator plausibly pleads that specific, identifiable claims actually were presented to the government for payment. Of course, whether such factual allegations in a given case meet the required standard *must be evaluated on a case-specific basis*.

32

Id. at 457-58 (emphasis added); cf. Clausen, 290 F.3d at 1312 (the relator's "failure to allege with any specificity if – or when – any improper claims were submitted to the Government is indeed fatal to his complaints *under the particular circumstances of this case*." (emphasis added)). The case-specific nature of the particularity inquiry was also clear as this Court sought to distinguish Nathan from cases like United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180 (5th Cir. 2009) (allowing a claim that identified dates of services but no actual bills), and United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 30 (1st Cir. 2009) (claim alleging dates and amounts sought from Medicare was sufficient), by explaining that "[b]ased on the nature of the schemes alleged in many of those cases, specific allegations of the defendant's fraudulent conduct necessarily led to the plausible inference that false claims were presented to the government." Nathan, 707 F.3d at 457; cf. Ebeid ex rel. U.S. v. Lungwitz, 616 F.3d 993, 998-99 (9th Cir. 2010) ("In our view, use of representative examples is simply one means of meeting the pleading obligation.") (citing Grubbs, 565 F.3d at 190).

The District Court overlooked this explanation and this resulted in the application of a rigid rule it mistakenly believed required dismissal of all defendants except the one for which the complaint identified three FHA-insured mortgage loans. See J.A. 715-16. The District Court's oversight is best illustrated by the fact that its extensive discussion of the Nathan decision omits any citation,

reference, or discussion of qualifying language designed to avoid the very result reached here. Compare J.A. 708-11, with Nathan, 707 F.3d at 457-58. This oversight let to the curious result in which the District Court found "that Relator has made Defendants aware of the circumstances of the alleged underlying scheme" but failed to give rise to a "reasonable inference" that false claims were "*necessarily* submitted to HUD for payments under the program." Compare J.A. 714, with J.A. 711 (emphasis original). Had the court below not mistakenly believed it was subject to a *per se* rule, it likely would have realized that the only reasonable inference to be drawn from the detailed allegations concerning the MBS trusts, trust PSAs, MBS investment disclosures, and OIG findings is that the fraudulent documents identified by the complaint were used to recoup trust losses first through foreclosure and then through HUD insurance claims.

This is precisely the sort of claim this Court was careful not to bar by its decision in Nathan and this error should be reversed.

## II.    A *per se* rule is irreconcilable with the rules of pleading and the FCA.

Alternatively, to the extent the District Court correctly read Nathan to adopt a bright-line rule, that decision should be reconsidered and overruled. If necessary to reach this issue, replacing the *per se* rule with a case-specific approach is consistent with the four purposes motivating Rule 9(b)'s particularity requirement and gives full effect to the remedial nature of the FCA—two ends not served by a

rigid approach. Such a conclusion is also supported by the weight of authority among the circuits, including several circuits that appear to have initially embraced a *per se* rule, but have since adopted the nuanced, case-specific approach Appellant believes the Court should adopt now if it has not already done so.

**A.    Identification of individual claims presented for payment is unnecessary to meet Rule 9(b)'s objectives.**

In Harrison I, this Court enumerated the four purposes motivating Rule 9(b)'s heightened pleading requirement:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of.... Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

Harrison I, 176 F.3d at 784 (quoting United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Ga., Inc., 755 F. Supp. 1055, 1056-57 (S.D. Ga. 1990)); see also Nathan, 707 F.3d at 456. By its express terms, all Rule 9(b) requires is notice of "the circumstances" of a fraud,[7] an objective met by a description of the who, what, when, where, and how. See Wilson, 525 F.3d at 379; see also DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990) (analogizing this pleading burden to writing "the first paragraph of any newspaper

---

[7] Fed. R. Civ. P. 9(b) ("a party must state with particularity the circumstances constituting fraud").

story."). While an admittedly heightened standard, it is not designed to be an insurmountable one. Accordingly,

> A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.

Harrison I, 176 F.3d at 784.

A pleading rule requiring whistleblowers to identify individual claims presented for payment fails to advance any Rule 9(b) objective. For example, here, the 214-page complaint describes the scheme in great detail even though there has never been any discovery served on Appellees. Nor has anyone suggested the allegations—resulting in criminal pleas and a $95 million civil recovery—are frivolous. Nor was there any suggestion below that Appellees were unable to formulate a defense because they lacked notice as to the nature of the scheme or the bad acts each is alleged to have taken in furtherance of it. The specific notice given to each individual Defendant (in addition to those allegations applicable to all Defendants) was even illustrated by a table submitted as part of Appellant's memorandum in opposition to the motion to dismiss that tied paragraphs in the complaint to individual Defendants. See Dkt. No. 321 at 53-59.

Grafting a requirement to plead the transactional details of a claim creates results incongruous with the federal rules of pleading. For example, in rejecting

such a requirement, the Fifth Circuit observed that even at trial, "a plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates to prove to a preponderance that fraudulent bills were actually submitted." Grubbs, 565 F.3d at 190. Thus, a rule that demands such detail to survive a motion to dismiss imposes a burden "significantly more than any federal pleading rule contemplates." Id. This is particularly true since knowledge is often inferential. United States ex rel. Lusby v. Rolls-Royce Corp., 570 F.3d 849, 854 (7th Cir. 2009). In explaining why it was not essential for a relator to produce invoices at the outset of a suit, the Seventh Circuit also highlighted the inexplicable result such a rule creates between pleading and proof by reasoning that "people are convicted beyond a reasonable doubt of conspiracy without a written contract to commit a future crime[.]" Id.

Lusby also highlights the incongruity between Rule 8's plausibility standard and Rule 9(b) particularity caused by the *per se* pleading requirement. In that case, the relator knew Rolls-Royce was concealing a defect in airplane engines sold to the government, but lacked access to the accounting department. See id. at 853-54. The inference that Rolls-Royce was submitting false claims for payment was plausible because the airplane manufacture had a contract with the military to sell engines and the military would not tender payment without receipt of a certification the relator knew to be false. See id. at 854. The district court's emphasis on the *possibility* the military paid for an engine without receiving the

37

certification misconstrued the relator's pleading burden by embracing that slight chance as the basis for an implausible conclusion: that the military paid for engine after engine without *ever* receiving certifications required by federal procurement regulations. See id. at 854-55. This was error because "[t]o say that fraud has been pleaded with particularity is not to say that it has been proved (nor is proof part of the pleading requirement)." Id. at 855.

The heart of the heightened pleading requirement is fair notice—a standard that can be met without identifying individual false claims. Concluding otherwise does violence to the term "plausible" as it has been read into Rule 8 and creates unnecessary tension between making "a short and plain statement" and Rule 9(b). An allegation is plausible when the pleader is capable of making factual assertions that give rise to an inference of wrongdoing. See Twombly, 550 U.S. 544; Iqbal, 556 U.S. 662. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). But in a case such as this—where Appellant detailed the fraud, identified trust documents requiring FHA-insurance submissions, and cited evidence of billions paid by HUD— requiring the identification of individual claims ignores the plausible fact that, of course, claims were submitted and requires the court to go looking for a *possible* explanation capable of justifying an implausible conclusion. See, e.g., J.A. 711

(finding the facts alleged insufficient "for a reasonable inference that false claims *necessarily* were submitted to HUD" (emphasis original)).

In <u>Lusby</u>, it was implausible Rolls-Royce made dozens of engines under contract but never submitted papers to obtain payment. It is equally implausible here that the Appellee trusts were required to recoup FHA insurance proceeds on behalf of investors, but never did. Respectfully, the only way to read Rules 8 and 9(b) together is without the *per se* rule. Since doing so still meets all of Rule 9(b)'s objectives, it is the reading the Court should adopt here.

### B.   A *per se* rule threatens the efficacy of the FCA as a remedial tool to fight fraud against the government.

Among the conduct actionable under the FCA is conduct that *causes* the presentation of a false claim or record material to payment. Specifically, the FCA imposes liability for any person who "(A) knowingly presents, or *causes* to be presented, a false or fraudulent claim for payment or approval; (B) knowingly *makes*, uses, or *causes to be made or used*, a false record or statement material to a false or fraudulent claim[.]" 31 U.S.C. § 3729(a)(1)(A)-(B) (emphasis added). The FCA is a remedial act first passed to expose and punish Civil War profiteers. <u>Grubbs</u>, 565 F.3d at 184 (citing S. Rep. No. 99–345, at 11 (1986), <u>reprinted in</u> 1986 U.S.C.C.A.N. 5266, 5276). To aid in rooting out fraud, the FCA authorizes suit by private persons serving as a "posse of *ad hoc* deputies to uncover and prosecute frauds against the government." <u>Id.</u> (quoting <u>United States ex rel. Milam</u>

v. Univ. of Tex. M.D. Anderson Cancer Ctr., 961 F.2d 46, 49 (4th Cir. 1992)). A *per se* pleading rule undermines the Act's efficacy as a tool to combat fraud by creating an unwarranted barrier to whistleblowers bringing cases where the theory of liability turns on the fraudster's false statement passing to the government through a third party. This concern has been powerfully present among federal circuits grappling with pass-through presentment questions and cited as compelling grounds not to dilute the strong medicine Congress prescribed in enacting the FCA.

For example, in Duxbury, sales representatives for a drug distribution and marketing company alleged the company defrauded the government by inflating a drug's average wholesale price that the government uses as a benchmark to set Medicare reimbursement rates. Id. at 16-17. The district court dismissed the complaint, holding Rule 9(b) "requires relators to provide details that identify particular false claims for payment that were submitted to the government[,]" id. at 29 (emphasis original, quotations omitted)—*i.e.*, specific prescriptions reimbursed by Medicare. The First Circuit disagreed, explaining the district court mistakenly failed to take notice of precedent that draws a distinction between direct presentment and pass-through liability.

> In [United States ex rel. Rost v. Pfizer, Inc., 507 F.3d 720 (1st Cir. 2007)], we noted a distinction between a qui tam action alleging that the defendant made false claims to the government, and a qui tam action in which the defendant induced *third parties* to file false claims with the government. In the latter context, we held that a relator could satisfy Rule 9(b) by providing "factual or statistical evidence to

40

strengthen the inference of fraud beyond possibility" without necessarily providing details as to each false claim.

Id. (emphasis original, citations to Rost, 507 F.3d at 732-33, omitted). The Duxbury relators' allegations crossed the particularity and plausibility thresholds because they included allegations of kickbacks to specific healthcare providers that supported the inference that the company's price manipulation scheme was intended to cause the submission of false claims.[8] Id. at 29-30.

This Court has twice recently taken guidance from the FCA's remedial purpose and cautioned against construing the Act to create perverse incentives for would-be fraudsters. In United States ex rel. Bunk v. Gosselin World Wide Moving, N.V., 741 F.3d 390 (4th Cir. 2013), the Court was asked whether the FCA's civil penalties provision offended the Eighth Amendment. In rejecting that argument, it explained:

> It was inevitable, we suppose, in view of the vast number of government contracts—many of prodigious size and sophistication— that we would confront FCA actions involving thousands of invoices, thus exposing culpable defendants to millions of dollars of liability for civil penalties. We are entirely comfortable with that proposition. When an enormous public undertaking spawns a fraud of comparable breadth, the rule set forth in Harrison I helps to ensure what we

---

[8] Notably, Duxbury also clarifies United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220 (1st Cir. 2004), which, not unlike Nathan, simply explained that "[i]n a case such as this," transactional billing details "[is] the type[ ] of information that *may* help a relator to state his or her claims with particularity." Id. at 233 (emphasis added), abrogation recognized by Claudio-De Leon v. Sistema Universitario Ana G. Mendez, 775 F.3d 41 (1st Cir. 2014).

reiterate is the primary purpose of the FCA: making the government completely whole.

*The district court's methodology cannot be said to have furthered that statutory purpose.* Indeed, an award of nothing at all because the claims were so voluminous provides a perverse incentive for dishonest contractors to generate as many false claims as possible, siphoning ever more resources from the government.

Id. at 407-08 (citations omitted, emphasis added). This reasoning was reaffirmed in United States ex rel. Drakeford v. Tuomey, 792 F.3d 364 (4th Cir. 2015), where the Court reiterated the government's "strong interest in preventing fraud" that makes the administration of public programs more burdensome and threatens to undermine public confidence. See id. at 389 (quoting United States v. Mackby, 339 F.3d 1013, 1019 (9th Cir. 2003)).

Construing a relator's pleading obligation to require identification of individual claims as a predicate to haling a defendant into court is inapposite with the remedial approach this Court has taken with FCA questions and creates precisely the sort of perverse incentive it has warned against. If left in place, the decision below offers a roadmap to future perpetrators on how to avoid liability by concocting increasingly elaborate pass-through schemes. By simply bifurcating the individuals tasked with creating fraudulent statements from the individuals tasked with submitting them, a sophisticated defendant like a bank can create an insurmountable pleading barrier that effectively eliminates the possibility of having to answer a FCA claim under a causes-to-be-presented theory. It cannot possibly

be correct that the pleading burden in a case such as this is exponentially higher simply because the nature of the wrongdoing is so complex.

The United States Department of Justice agrees, and has consistently argued, that a *per se* rule would have a deleterious effect on the FCA by excluding a certain class of cases from the private enforcement scheme. See, e.g., U.S. Amicus Br. at 14-16, United States ex rel. Nathan v. Takeda Pharm. North Am., Inc., 134 S. Ct. 1759 (2014) (No. 12-1349); U.S. Amicus Br. at 16-17, Ortho Biotech Prods., L.P. v. United States ex rel. Duxbury, 130 S. Ct. 3454 (2010) (No. 09-654). The Government points to cases like Lusby and Grubbs as claims supported by detailed fraud allegations that would nonetheless have been "dismissed [under a *per se* rule] because neither relator was familiar with the minutiae of his employer's billing." U.S. Amicus Br. at 15, Nathan, supra. "Because a prospective relator is unlikely to be privy to such details unless she 'works in the defendant's accounting department,' a rule demanding the details of specific false claims would 'take[ ] a big bite out of *qui tam* litigation.'" Id. (quoting Lusby, 570 F.3d at 854). In the Government's view, attaching such "dispositive significance" to the identification of specific claims is "unwarranted" because "[t]he government rarely if ever needs a relator's assistance to identify claims for payment that have been submitted to the United States." Id. at 16. Thus, by burdening the party least able to identify specific claims with the burden of doing so at the inception of the action, the *per se*

rule serves only to guarantee certain frauds can never be brought into court. This result undermines the FCA as a tool to reach all types of fraud, which this Court has zealously guarded by declining to adopt any "rigid, restrictive reading." Harrison I, 176 F.3d at 788 (quoting Neifert, 390 U.S. at 232).

* * *

To the extent the District Court correctly discerned this Court's intent in Nathan, Appellant respectfully submits that precedent should be overruled in light of concerns raised here. Indeed, clear guidance is needed as Appellant's claim is not the only one excluded as a result of a district court's misapplication of the particularity requirement in a false claims case. See Br. Appellant, United States ex rel. Palmieri v. Alpharma, Inc., No. 14-1388 (4th Cir. June 9, 2014) (arguing the district court misapplied Nathan in dismissing the off-label marketing claim for want of a particular presentment claim).

The weight of authority in the federal circuits has already reached the conclusion Appellant advances here. See Duxbury, 579 F.3d 13; Grubbs, 565 F.3d 180; Lusby, 570 F.3d 849; Ebeid, 616 F.3d 993. Other appellate courts have found it necessary to clarify that earlier decisions did not signal a departure from case-specific analysis. For example, after affirming the dismissal of a complaint that failed "to identify any specific claim[,]" United States ex rel. Sikkenga v. Regence BlueCross BlueShield, 472 F.3d 702, 727-28 (10th Cir. 2006), the Tenth Circuit

44

clarified that a relator's complaint "need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." United States ex rel. Lemmon v. Envirocare of Utah, Inc., 614 F.3d 1163, 1172 (10th Cir. 2010) (citing Duxbury, Lusby, and Grubbs, supra). Still other courts are moving in this direction as subsequent decisions by three circuits that embraced a *per se* rule now raise questions about the endurance of their commitment to it.[9]

The most notable shift among the circuits has occurred in the Eighth and Eleventh Circuits. After initially requiring "some representative examples" of false claims, United States ex rel. Joshi v. St. Luke's Hosp., Inc., 441 F.3d 552, 560 (8th Cir. 2006), the Eighth Circuit limited the application of that rule to those instances where the allegations "lack sufficient indicia of reliability" by holding a relator can satisfy Rule 9(b) "without pleading representative examples" so long as the "particular details of a scheme to submit false claims [are] paired with reliable indicia that lead to a strong inference that claims were actually submitted." United States ex rel. Thayer v. Planned Parenthood of the Heartland, 765 F.3d 914, 917-19

---

[9] E.g., compare United States ex rel. Bledsoe v. Community Health Sys., Inc., 501 F.3d 493, 504 (6th Cir. 2007) ("We hold that pleading an actual false claim with particularity is an indispensable element of a complaint that alleges a FCA violation in compliance with Rule 9(b)."), with Chesbrough v. VPA, P.C., 655 F.3d 461, 471 (6th Cir. 2011) (declining to rule out the possibility "that the requirement that a relator identify an actual false claim may be relaxed when, even though the relator is unable to produce an actual billing or invoice, he or she has pled facts which support a strong inference that a claim was submitted.").

(8th Cir. 2014) (quoting <u>Grubbs</u> and collecting cases taking this view). In the Eleventh Circuit, the court responsible for <u>Clausen's</u> exacting standard allowed a complaint to go forward after a case-specific analysis finding the allegations bore an indicia of reliability even in the absence of billing details. <u>See</u> <u>United States ex rel. Walker v. R&F Properties of Lake County, Inc.</u>, 433 F.3d 1349, 1359-60 (11th Cir. 2005).

 In short, those circuits with precedent suggesting a rigid pleading standard have found it necessary to clarify that position. To the extent this case cannot be resolved by simply highlighting the need to conduct a case-specific analysis when considering a motion to dismiss, the Court should take guidance from its sister circuits and explicitly repudiate the *per se* rule.

# CONCLUSION

For these reasons, Appellant respectfully submits that the opinion of the

District Court should be reversed.

Respectfully submitted by:

/s/Richard A. Harpootlian
RICHARD A. HARPOOTLIAN, P.A.
     Richard A. Harpootlian (Fed. ID # 1730)
     rah@harpootlianlaw.com
     Christopher P. Kenney (Fed. ID # 11314)
     cpk@harpootlianlaw.com
     1410 Laurel Street
     Post Office Box 1090
     Columbia, SC 29202
     Telephone: (803) 252-4848
     Facsimile: (803) 252-4810

*ATTORNEYS FOR APPELLANT*
  *LYNN E. SZYMONIAK*

September 28, 2015
Columbia, South Carolina.

47

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>
### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains <u>10,905</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

Dated:  September 28, 2015          /s/Richard A. Harpootlian
                                    Richard A. Harpootlian (Fed. ID # 1730)

                                    *ATTORNEY FOR APPELLANT*
                                    *LYNN E. SZYMONIAK*

## **CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on September 28, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all the registered CM/ECF users.

I further certify that I served a paper copy of the foregoing via UPS, Ground upon the following:

William N. Nettles, U. S. Attorney
OFFICE OF THE UNITED STATES ATTORNEY
1441 Main Street, Suite 500
Columbia, SC  29201-2692

Attorney General Loretta E. Lynch
UNITED STATES DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Shelly N. Gannon
Shelly N. Gannon
GIBSON MOORE APPELLATE SERVICES, LLC
206 East Cary Street
P.O. Box 1460 (23218)
Richmond, VA  23219
(804) 249-7770